IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 11, 2018

**TRACY LOONEY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. F-68273  Royce Taylor, Judge**

_____

**No. M2018-00214-CCA-R3-PC**

_____

The petitioner, Tracy Looney, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial.  After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Russell Nixon, Murfreesboro, Tennessee, for the appellant, Tracey Looney.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions of rape of a child, felony child abuse, and misdemeanor child abuse and sentences, as follows:

This case arises from the petitioner's interactions with his wife's children. *State v. Mark Tracy Looney*, No. M2014-01168-CCA-R3-CD, 2016 WL 1399344 (Tenn. Crim. App. Apr. 7, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016).  The [petitioner's] wife

had three children from a previous marriage, J.H., T.H., and A.H. *Id.* at *1. Together the petitioner and his wife had a child, J.L. *Id.* Pursuant to a parenting plan, J.H., T.H., and A.H. stayed with their mother at the residence she shared with the petitioner ("the Looney residence"). *Id.* It was during the petitioner's wife's parenting time with her children that the petitioner's alleged physical abuse of J.H. and T.H. and sexual abuse of A.H. occurred. *Id.*

J.H., who was eleven years old at the time of trial and in the fifth grade, testified regarding physical abuse by the petitioner. *Id.* at *2. He testified that during one incident, the petitioner "raised him [up] by the neck," and when the petitioner finally released him J.H. hit his head hard against the wall. *Id.* J.H. stated he still has neck pain to this day based on that incident. *Id.*

J.H. recalled another occasion when the petitioner's wife, T.H., and he were "watching" J.L. while the petitioner cooked breakfast. *Id.* J.L. was in his playpen but "somehow" got out and fell onto a toy truck. *Id.* J.H. said that the petitioner was not angry with his wife but rather he became angry at J.H. and T.H. *Id.* J.H. said that the petitioner kicked him in his stomach before J.H. fled to the bathroom and that the petitioner kicked and "threw" T.H., who "fell into the kitchen into the microwave and cabinets." *Id.*

J.H. also testified about "going mushrooming" with the petitioner. *Id.* at *3. He explained that he would go with the petitioner into the woods across the street or to another wooded area near "someone's" house to look for mushrooms. *Id.* J.H. did not know ultimately what became of the mushrooms they picked, but he said that the petitioner would take the mushrooms "to someone's house." *Id.* J.H. recalled on one occasion when the petitioner took only A.H. to look for mushrooms. *Id.* J.H. said that he was "very worried" and "afraid [A.H.] might like get those spiky vines prickle her" or that she might get scratched on her face by twigs. *Id.* J.H. said that the petitioner and A.H. were gone for a long time and "everyone" got worried. *Id.* At some point "Mamaw" drove the petitioner's wife, J.H., and T.H. to the area where the petitioner and A.H. were supposed to be looking for mushrooms. *Id.* J.H. and T.H. went a short way into the woods and unsuccessfully called out for the petitioner and A.H. *Id.* J.H. said that when the petitioner and A.H. did finally return, A.H.'s legs were "prickled by the thorny vines." *Id.*

T.H. testified that he was nine years old at the time of trial but had been seven years old during spring break of 2012. *Id.* T.H. also testified regarding several instances of abuse including the time the petitioner hit him with a spatula. *Id.*

Caroline Patterson, a nurse practitioner, testified as an expert witness in the field of child sexual abuse. *Id.* at *4. Ms. Patterson testified that initially a social worker met with A.H. to ask about health issues. *Id.* A.H. disclosed that the petitioner "'put his private area on my private area'" multiple times until "white stuff came out." *Id.* In addition to penile penetration, A.H. also described oral penetration, so Ms. Patterson tested A.H.'s throat for possible infection. *Id.* As to the penile penetration A.H. said that "'it hurted, but no bleeding,'" which, according to Ms. Patterson, increased the likelihood of injury having occurred. *Id.* A.H. reported that this activity occurred when no one else was around and "'under the covers.'" *Id.*

A.H. testified that she was seven years old and in the first grade. *Id.* A.H. identified a photograph of the petitioner's living room and pointed out the green chair where the petitioner "forced" his "private area" in her "private area." *Id.* A.H. said that she was sitting in the petitioner's lap at the time and "it hurt in [her] private area." *Id.* A.H. confirmed that she remembered talking to "another Ms. Nelson" about "what the [petitioner] did to her." *Id.* She stated that she told Ms. Nelson about the incident in the living room where the petitioner put his penis inside her vagina and about another incident in the bedroom. *Id.* About this other incident that occurred in the petitioner's bedroom, A.H. said "he forced me to pull my pants down so he could put his private area into mine." *Id.* A.H. described the petitioner's penis as "peach" or skin-colored and said that the petitioner instructed her to lie down on his bed. *Id.*

A.H. could not recall her age at the time of these incidents but said that it was before she began attending school. *Id.* A.H. believed the incident in the bedroom occurred during summer and that the incident that occurred on the green chair in the living room occurred during spring break. *Id.* A.H. recalled that she and her brothers stayed at the Looney residence for the entire week of spring break. *Id.* A.H. said that the petitioner told her not to tell anyone about these incidents or he would be unable to see her again. *Id.* A.H. said that she told the petitioner, "Okay," but she told her father and step-mother anyway because "it hurt," and she did not want it to happen [] again. *Id.*

When asked if she liked the petitioner, A.H. responded, "It depends." *Id.* She stated that she did not "like it when he did the [private area] stuff that he did." *Id.* A.H. recalled another incident when she and the petitioner were in "[the] back room," and the petitioner put his "private area" into her mouth. *Id.* She said, "He took it out and white stuff came out." *Id.* She said that the petitioner took an item of clothing and "wiped it up." *Id.* A.H. said that the petitioner also put his penis in her mouth in the living room of the residence. *Id.*

A.H. testified about an incident that occurred during summer break when she and the petitioner went mushroom hunting together. *Id.* A.H. confirmed that this was the

only time she had gone mushroom hunting and that only she and the petitioner went mushroom hunting that day. *Id.* A.H. stated that she could not recall anything that had occurred between her and the petitioner while mushroom hunting. *Id.* She agreed that it had been a long time since she had talked about "these things" and that it would be helpful for her to watch the recording of the interview of her statements about her interactions with the petitioner. *Id.* The defense objected to the State showing A.H. the recording to refresh her recollection. *Id.* The State decided to proceed with testimony and not play the recording for A.H. at that time. *Id.* A.H. maintained that she and the petitioner only hunted for mushrooms and nothing else occurred between the two while hunting for mushrooms. *Id.*

Father testified that he contacted DCS about the allegations of sexual abuse and agreed that he had contacted DCS before in regard to incidents involving inappropriate touching by A.H.'s maternal grandmother and the petitioner. *Id.* at *7. Father said that the maternal grandmother had "reached in [A.H.]'s pants and wiped her down there in a hallway at church." *Id.* He said this behavior was "odd" and made A.H. uncomfortable, so he made a complaint through DCS. *Id.* As to the prior reported inappropriate contact with the petitioner, A.H. had disclosed that the petitioner "had laid her down up on the washing machine and was looking at her down there with a flashlight because she was complaining of burning down there." *Id.*

LaToya Nelson, a fifth-grade teacher at the time of trial, testified that she had previously worked for the Child Advocacy Center as a forensic interviewer in child sex abuse cases. *Id.* at *8. Ms. Nelson said that DCS referred A.H. to the Child Advocacy Center for an interview and that she met with A.H. on April 30, 2012. *Id.* Ms. Nelson said that Father accompanied A.H. to the interview but remained in the lobby area while she spoke with A.H. *Id.* She explained that there was a closed circuit "observation room" where law enforcement or DCS employees could watch an interview in progress. *Id.* During A.H.'s interview DCS employee Kevin Smith was present in the observation room. *Id.*

On cross-examination, Ms. Nelson stated that she had spoken with A.H. on a previous occasion, May 27, 2011. *Id.* When asked if that interview was recorded, she responded, "All of our interviews are recorded." *Id.*

The petitioner's wife testified that she learned about the incidents alleged in this case through Stepmother. *Id.* She stated that she did not have a good relationship with Stepmother but that she believed that Stepmother took good care of J.H., T.H., and A.H. *Id.* According to the petitioner's wife, Stepmother called her residence, spoke with her initially, and then asked to speak with the petitioner. *Id.* The petitioner's wife could not

recall when Stepmother called the house but said it was "[q]uite a while" after the children had stayed with her during spring break. *Id.*

The petitioner's wife testified that the petitioner drove her to the Sheriff's Department where they met with Detective McCallum in her office. *Id.* The petitioner's wife said that she and the petitioner met with Detective McCallum on two different occasions. *Id.* During the first meeting, they spoke with the detective about J.H. and T.H. *Id.* The petitioner's wife said they discussed an incident during which the petitioner "went back to the back bedroom." *Id.* The petitioner's wife said that she was either in the living room or her bedroom at the time of the incident and could not see or hear what occurred in the back bedroom. *Id.*

The petitioner's wife testified that the children would often sit in the petitioner's lap while sitting in the living room and that A.H. called the petitioner, "Daddy." *Id.* at *9. The petitioner's wife explained that there were two beds in the bedroom she shared with the petitioner. *Id.* She slept in one, and the petitioner slept in the other. *Id.* When A.H. would stay with them, however, A.H. slept in the petitioner's bed, and the petitioner would sleep in the bed with the petitioner's wife. *Id.* The petitioner's wife recalled an incident when J.H. and T.H. had gone to pick blackberries with the petitioner. *Id.* When they returned, the petitioner took A.H. out to pick blackberries, not mushrooms, because she felt "left out." *Id.* When asked if the petitioner returned with blackberries, she stated, "No. I don't know." *Id.* The petitioner's wife said that, while the petitioner took A.H. to pick blackberries, she stayed home with the three boys. *Id.* At some point she went out in the backyard and called out for the petitioner and A.H. but received no response. *Id.* She said that the petitioner had taken A.H. to pick blackberries on their neighbor's property. *Id.*

The petitioner's wife testified that she thought the second meeting with Detective McCallum was "like the next day." *Id.* She said that she and the petitioner never spoke about the allegations or why they were going to the Sheriff's Department. *Id.* During this second meeting, Detective McCallum told them about the allegations involving A.H. *Id.* The petitioner's wife said that the petitioner took with him a pair of shorts when they met with Detective McCallum the second time, but she was unaware of why he brought the shorts. *Id.*

Outside the presence of the jury, the State played portions of the recorded interviews with Detective McCallum. *Id.* The petitioner's wife confirmed that it was her voice on the recording. *Id.* The State resumed questioning the petitioner's wife about her statements to Detective McCallum. *Id.* The petitioner's wife stated that she recalled telling Detective McCallum that she had some "concerns" or "suspicions" about A.H. and the petitioner. *Id.* She said that her suspicions were based on the fact that A.H. liked to

- 5 -

sit on the petitioner's lap. *Id.* When asked if the petitioner liked for A.H. to sit on his lap, the petitioner's wife said, "He didn't mind. All of the kids sat in his lap." *Id.* Even though all of the children sat on the petitioner's lap, the petitioner's wife said that she spoke with the petitioner about her concerns but could not recall whether it was before or after the couple met with Detective McCallum.

The petitioner's wife testified that she did not recall the incident Father first reported to DCS about the petitioner's inappropriate contact with A.H. *Id.* She said that A.H. developed a rash on her inner thigh area and that the petitioner had applied ointment on the rash. *Id.* The petitioner's wife said that she was present in the bathroom when the petitioner applied the ointment. *Id.* As to the allegation against her mother, A.H.'s maternal grandmother, she explained that her mother was merely tucking A.H.'s shirt in at church. *Id.*

The petitioner's wife denied any memory of speaking privately with the petitioner while at the sheriff's department. *Id.* She could not recall a discussion about "white stuff coming out of his private" or the petitioner telling her that he was asleep when that occurred. *Id.* The petitioner's wife confirmed that, despite having listened to the audio recording of the discussion, she could not remember what she and the petitioner spoke about at the sheriff's department. *Id.* She agreed that those statements were on the recording and true at the time she made the statements. *Id.* The petitioner's wife said that she did not recall telling Detective McCallum that, after leaving the sheriff's department the first time, the petitioner had told her that A.H. had approached him while he was asleep and started "playing with it" and woke him up. *Id.* The petitioner told the detectives that he told A.H. to stop, and she put her lips on "it." *Id.* The petitioner's wife maintained that she could not recall this information even though she had just listened to the video recording. *Id.* The petitioner's wife did recall telling Detective McCallum that she thought there was more to the story than the petitioner disclosed to her. *Id.* She agreed that she did not believe that A.H. went over to the petitioner and "pulled his penis out and put her lips on it." *Id.*

The petitioner's wife testified that she told Detective McCallum that she kept trying to ask the petitioner about his interactions with A.H. but that he "really didn't want to talk to me about it." *Id.* at *10. The petitioner's wife agreed that she had told Detective McCallum that she and the petitioner had not engaged in sex since J.L. was born. *Id.* She told Detective McCallum that she "would try" but that the petitioner was disinterested. *Id.*

On cross-examination, the petitioner's wife stated that she did not believe that the petitioner had done "this." *Id.* On redirect examination, the petitioner's wife agreed that she told Detective McCallum that she believed "it." *Id.* She further agreed that she and

the petitioner had not had "a lot of contact" since the allegations had been raised and that she missed him. *Id.*

Mickey McCullough, a Rutherford County Sheriff's Department sergeant, testified that he spoke with the petitioner on June 13 and June 14, 2012. *Id.* Sergeant McCullough stated that his initial interactions with the petitioner and the petitioner's wife on June 13, 2012, were "helpful" in nature; for example, he showed them to the bathrooms and brought them water. *Id.* He said that he told both the petitioner and his wife that they were "free to go. *Id.* They don't have to be here." *Id.* Sergeant McCullough confirmed that there was a video recording of the interviews. *Id.*

Sergeant McCullough testified that he observed a conversation between Detective McCallum and the petitioner and a conversation between the petitioner and his wife before he entered the interview room. *Id.* He said that Detective McCallum asked him to come into the interview room to "be a little more direct with the [petitioner]" because the petitioner had been telling Detective McCallum "partial truths" and "out and out lies." *Id.* Sergeant McCullough recalled that the petitioner was very comfortable speaking with Detective McCallum and his wife. *Id.* The petitioner even complimented Detective McCallum on how she was conducting the interview. *Id.* The petitioner's demeanor changed, however, when Sergeant McCullough spoke with him. *Id.* He said that the petitioner became "more guarded" and gave "partial admissions" about what had occurred, which were inconsistent with his statements to Detective McCallum. *Id.* Sergeant McCullough said that, approximately fifteen minutes after he began speaking with the petitioner, the petitioner remembered an event. *Id.* Sergeant McCullough said that often a perpetrator is hesitant to disclose his conduct to a female, especially when the victim is a female. *Id.* Thus, Sergeant McCullough was not surprised when the petitioner had denied any recollection with Detective McCallum but shortly thereafter recalled an incident when speaking with him. *Id.*

Sergeant McCullough testified that the petitioner went home after the June 13 interview and, as he left, apologized to Detective McCallum "for lying." *Id.* On the following day, the petitioner told Sergeant McCullough that "it's possible" that while he was sleeping, A.H. pulled his penis out of his shorts or his penis "flopped out" of his pants, "[a]nd he woke up and saw her mouth on his penis." *Id.* The petitioner said he responded to A.H. by pushing her away and telling her, "no." *Id.* The petitioner brought three pairs of shorts on June 14, 2012, that he may have been wearing during the incident. *Id.* Sergeant McCullough measured the inseam of the shorts, six and a half inches, and the length of the petitioner's penis, "a little less than two inches." *Id.* The shorts the petitioner brought had elastic waists with no zippers or opening in the front. *Id.* The petitioner stated that he did not wear underwear. *Id.* Sergeant McCullough explained

- 7 -

that he measured the inseam of the shorts and the petitioner's penis because the petitioner had multiple explanations of how the incident had occurred. *Id.*

Kevin Smith, an investigator with DCS, testified that, after speaking with J.H. and T.H., he had concerns about domestic violence issues with the petitioner. *Id.* at *11. He learned that an order of protection was in place at the time, so he went to the Looney residence to meet with the petitioner and his wife. *Id.* The petitioner told Mr. Smith that he was a good role model for the children and that they looked up to him. *Id.* The petitioner said that he and his wife had formerly used spanking as a form of disciplinary intervention but no longer did so. *Id.* He told Mr. Smith that the only time that he had ever "put his hands on any of the children" was on an occasion when J.H. had wanted to "run off." *Id.* The petitioner said that he "gently put his hand" on J.H.'s shoulder to restrain him. *Id.* As to the incident that J.H. alleged the petitioner grabbed him by his neck, the petitioner said that he only went in the boys' room to turn off the television. *Id.*

Mr. Smith testified that there were two things that struck him during this visit to the Looney residence. *Id.* First, J.H. and T.H.'s description of the residence was detailed and accurate. *Id.* Second, the petitioner made a point to tell Mr. Smith that he did not have full use of his left arm, due to a stroke, and could not even pick up a gallon jug of water with the left arm. *Id.* Later, Mr. Smith observed the petitioner pick up J.L. with his left arm. *Id.* Mr. Smith said that he closed the physical abuse complaint toward the end of April with the classification "substantiated for physical abuse." *Id.*

Mr. Smith testified that, within ten days of closing the physical abuse complaint involving J.H. and T.H., DCS received another referral involving the sexual abuse of A.H. *Id.* Mr. Smith was also assigned this complaint. *Id.* Mr. Smith said that he had spoken to A.H. before regarding a 2011 allegation of inappropriate touching by A.H.'s maternal grandmother that was classified "unsubstantiated." *Id.* Mr. Smith said that there was no complaint against the petitioner at that time. *Id.* The only referral involving the petitioner was the sexual abuse allegation received on April 30, 2012. *Id.*

Mr. Smith testified that he observed the forensic interview of A.H. at the Child Advocacy Center on a closed circuit monitor from an adjacent room. *Id.* at *12. Mr. Smith said that he observed A.H. sitting "very comfortably," and the interviewer "building rapport." *Id.* The interview lasted a little more than thirty minutes and then A.H. was returned to her parents. *Id.* After the interview, Mr. Smith encouraged Father to take A.H. to Our Kids in Nashville for evaluation. *Id.* He also referred the family to Dr. Hanket for counseling. *Id.* Mr. Smith said that, toward the end of May, he and Detective McCallum determined that they needed to speak with A.H. again. *Id.* This time the interview was held in a conference room at the Department of Children's Services. *Id.* In this interview, Mr. Smith "for lack of a better word challenge[d]" some

of A.H.'s disclosure and A.H. "insist[ed]" that "these things happened." *Id.* Based upon his investigation, Mr. Smith had no concerns about A.H. remaining in Father's custody. This referral was substantiated and the multidisciplinary team agreed "to indicate (sic) [the petitioner] for sex abuse." *Id.*

After hearing this evidence, the jury convicted the petitioner of four counts of rape of a child, one count of felony child abuse, and one count of misdemeanor child abuse. *Id.* After a subsequent sentencing hearing, the trial court sentenced the petitioner to serve an effective sentence of fifty years in prison. *Id.*

After the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition for post-conviction relief wherein he alleged trial counsel was ineffective for failing to provide the petitioner with a complete copy of his discovery and in exercising poor trial strategy.

At the post-conviction hearing, trial counsel testified he spoke with the petitioner several times about testifying, initially believing the petitioner would testify. However, as the trial progressed, trial counsel realized the petitioner's testifying was "not a strong option." Specifically, trial counsel was concerned because the State possessed jail phone calls between the petitioner and his wife in which the petitioner made statements that "were not good," and trial counsel did not want these to come out on cross-examination. However, because the State also played several of the petitioner's taped statements for the jury, the petitioner was able to tell his side of the story without being subjected to cross-examination. Near the end of the trial, the petitioner and trial counsel spoke again about the possibility of testifying, and the petitioner "knew at that point just from watching in the courtroom why we weren't going to do it." Trial counsel agreed he would advise a client against testifying if he felt it was necessary. However, he had never unilaterally removed the option of testifying from a client and did not take the petitioner's case on the condition that the petitioner forsake his right to testify.

Trial counsel testified he made several attempts to obtain the video of A.H.'s interview with Ms. Nelson regarding the unsubstantiated accusations against the petitioner and A.H.'s maternal grandmother. Trial counsel requested all videos of A.H. from the State; however, he could not recall if he specifically requested the video of Ms. Nelson's first interview. Although Ms. Nelson testified all of her interviews were recorded, a videotape of A.H.'s initial interview was not found. Because he believed the video may have included exculpatory information, trial counsel argued on direct appeal the petitioner was entitled to a new trial based on the State's failure to turn over the video.

When asked about discovery, trial counsel testified he met with the petitioner "as much as any person [he has] ever met" and reviewed all discovery with him. Trial counsel did not leave the discovery material with the petitioner, however, because the petitioner was "fearful for his life" and did not want material related to child sex abuse in his cell. Trial counsel stated this was not a problem because the facts in the case were "fairly simple."

The petitioner then testified, stating he spoke with trial counsel at their initial consultation about the possibility of testifying. The petitioner stated trial counsel would not represent him unless the petitioner agreed not to testify on his own behalf. Despite the petitioner's desire to testify, he did not feel it was an option due to trial counsel's earlier statements.

The petitioner was not aware of A.H.'s first interview with Ms. Nelson until trial, and did not know if a video of the interview existed. In regards to discovery, the petitioner stated trial counsel would sometimes bring paperwork with him, but did not leave anything for the petitioner to review. Trial counsel did not go over the State's discovery with the petitioner and did not provide him with a copy of the indictment. While the petitioner understood the charges against him, he was unaware of what evidence the State would use at trial.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective in failing to obtain a video recording of the first interview with A.H., in failing to provide a full copy of the State's discovery to the petitioner, and in preventing the petitioner from testifying in his own defense. The State contends the post-conviction court correctly denied the petition as the petitioner failed to meet his burden. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of

counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

The petitioner argues trial counsel was ineffective for failing to obtain the video recording of A.H.'s first interview with Ms. Nelson, a former forensic interviewer with the Child Advocacy Center, in failing to provide discovery to the petitioner, and in preventing the petitioner from testifying at trial. The petitioner contends trial counsel's failures left him "unable to properly weigh his odds at trial." The record, however, fails to support any of the petitioner's claims.

At the post-conviction hearing, trial counsel testified he searched diligently for Ms. Nelson, who was difficult to locate because she had changed professions since interviewing A.H., and subpoenaed her to trial. In addition, trial counsel requested all videos of A.H. from the State, receiving one video "a week or ten days before trial." However, he could not recall whether he specifically requested the first interview of A.H. prior to trial. Trial counsel addressed this issue in the petitioner's direct appeal, arguing the petitioner was entitled to a new trial based on the State's failure to turn over the video of A.H.'s first interview with Ms. Nelson. This Court found the issue without merit because the petitioner could not prove whether the video exists. Trial counsel was unsure whether the recording was ever found.

While the petitioner claims he did not know about the interview or video recording prior to trial, he failed to produce the video during the post-conviction hearing or call Ms. Nelson to discuss the video. Without the actual video or Ms. Nelson's testimony, this Court has no way of determining whether the video exists or, more importantly, whether the missing video prejudiced the petitioner at trial. *See Daetrus Pilate v. State*, No. W2017-02060-CCA-R3-PC, 2018 WL 3868484, at *5 (Tenn. Crim. App. Aug. 14, 2018). Furthermore, implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. The petitioner has failed to provide any evidence demonstrating how he was prejudiced by trial counsel's failure to obtain the video recording. Accordingly, the petitioner is not entitled to relief.

Regarding discovery, trial counsel explained he did not leave discovery with the petitioner because the petitioner was "fearful for his life," and they agreed trial counsel "would not put any documents in his cell." However, trial counsel met with the petitioner "as much as any person [he has] ever" represented, and they reviewed the discovery together during those meetings. Trial counsel did not bring the discovery every visit because the "facts are fairly simple." The petitioner testified trial counsel would sometimes bring paperwork with him but alleged they did not go over each piece of the State's evidence. He did not know what evidence the State would use against him at trial. However, as previously addressed, the post-conviction court accredited trial counsel's testimony, and nothing in the record preponderates against its factual findings. *See*

*Tidwell*, 922 S.W.2d at 500. Additionally, the petitioner has failed to prove by clear and convincing evidence his factual claim that he did not receive discovery. The petitioner is not entitled to relief.

Finally, the petitioner contends trial counsel prevented him from testifying at trial. Trial counsel testified he and the petitioner discussed the issue of testifying several times throughout the case. Although he originally felt it was a strong option, as the trial progressed, trial counsel felt it was not in the petitioner's best interest to testify. Trial counsel was worried the petitioner would be asked about jail phone calls between him and his wife when he made statements that "were not good." In addition, the State played some of the petitioner's recorded statements during trial, which allowed the petitioner to tell his story without subjecting him to cross-examination. Trial counsel maintained he may have advised the petitioner not to testify, but he had never prevented a client from testifying. The petitioner testified he voiced his desire to testify, but did not think it was an option because, according to the petitioner, trial counsel had initially said he would not take the case if the petitioner intended to testify. However, on cross-examination, the petitioner acknowledged he could have hired another lawyer if he wished. When asked what his testimony would have been, the petitioner simply stated he "would tell the truth." Despite his claim to "tell the truth," the petitioner failed to offer any testimony that would rebut the overwhelming proof of his guilt. Thus, the petitioner has failed to establish prejudice. Additionally, as discussed above, the post-conviction court accredited trial counsel's testimony, and nothing in the record preponderates against its factual findings. *See Tidwell*, 922 S.W.2d at 500. The petitioner is not entitled to relief.

In denying post-conviction relief, the post-conviction court noted many of the issues raised by the petitioner relate to trial strategy and found "the strategy used by [trial counsel] on all these issues was an appropriate strategy." We agree. Trial counsel's strategic and tactical choices will not be second guessed when those choices are based on informed preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Simply because trial counsel's strategy was unsuccessful or even hurt the defense does not render the assistance ineffective. *Id.* Moreover, no evidence exists in the record to support the petitioner's attack on trial counsel's performance or how the alleged deficient performance affected the outcome of his trial. *See Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

- 13 -

_____
J. ROSS DYER, JUDGE